310-0156 John Gnutek v. John Baker v. Illinois Department of Revenue Acolyte plus account by Mr. Neal Bawe Mr. Baker Good morning. Thank you. May it please the court, Mr. Bawe. My name is John Baker and I represent John Gnutek in this appeal. We are here today reviewing the decision of the Illinois Civil Service Commission. Mr. Gnutek was employed by the Illinois Department of Revenue. As part of his employment, he was assigned to work for the Illinois Gaming Board. As part of that assignment, he was stationed at the Empress Casino in Joliet, Illinois. He had a number of different job duties that he performed. We presented in our briefs his past performance record. For a large part, I think of his career that is undisputed. He was considered to be a model employee, an exceptional employee. Ultimately, the Department of Revenue decided to terminate his employment. We appealed that matter to the Illinois Civil Service Commission. The Civil Service Commission proceeding is, in many ways, like a criminal prosecution. You have two elements. First, the decision of whether there has been a violation of a rule or of a statute. The second phase is the punishment phase. What is the appropriate level of discipline? Different from a criminal trial, though, those two phases are not bifurcated before the Civil Service Commission when they are conducting evidence. But they are the two inquiries that the Civil Service Commission must make. Now, we've raised a number of issues in our brief. I want to address a couple of them for you here today. Our first issue revolves around, I guess, a collection of facts that were found that we believe are clearly erroneous. They are an entire underpinning of the decision by the Administrative Law Judge and by the Commission, and they simply cannot stand. In this case, the Department of Revenue has painted Mr. Gurutech as somewhat a Julian Assange wannabe, a covert employee who's messing around looking for documents to, I think they have said, further his own self-aggrandizement. Now, in support of this, they point to an incident that occurred on August 3rd. This was an incident where, and I think it might help to understand a little bit about the workspace where Mr. Gurutech worked. Mr. Gurutech worked at the Empress Casino. By statute, by Illinois statute, the boat, the casino, is obligated to provide a private room or private office suite for the Illinois Gaming Board for its regulators to work. This is where Mr. Gurutech worked. Mr. Gurutech and his co-employees shared a computer terminal. They shared a computer terminal. You were supposed to, when you got there, log on. When you left the computer, log off. And most of your duties actually took place out on the actual casino floor. One day, Mr. Gurutech goes in. He thinks he has forgotten to log off previously because the screen is still up, and so he starts looking through an email. Does some things to try and get the email. Can't get it. And from his mind, that's essentially the end of the story. Now, what is important to understand is there's no significance to this email whatsoever. It was a document that if he wanted, he could have gotten it anyway. He could have contacted the state. Is that in the record? Yes, it is. Absolutely, it's in the record. He could have accessed that any way he wanted. In fact, Justice Wright, this was a document that was a report that was developed by the statewide terrorism, it's called STIC, it's acronyms STIC. And Mr. Gurutech, if he wanted a document from STIC, all he had to do was pick up the phone and say, I want a document from STIC. Okay? There is nothing in the record anywhere to say that that particular document provided any personal benefit whatsoever for Mr. Gurutech. Is the document itself in the record? No. The document itself is not in the record. It was never turned over. We've never seen the document. We don't know what it is. So how can you describe it to us that it's something he could have gotten easily? Because that was agreed upon by them during the testimony. They described what the document was. This was a report. Mr. Gurutech, as a law enforcement officer, had the ability to access the STIC database. And if he wanted to get a STIC report on any particular casino patron, all he had to do was contact Springfield, make a request for the report, and it would be forwarded to him. That is all contained within the record. Thank you. Okay. And so that was that particular document. There's nothing to suggest that this STIC report was any more significant than anything else or that it played a role in anything. Excuse me. You said it was an accident, but didn't he forward it to when he couldn't get it out? He forwarded it to his own unit. He could not get it out. And what John testified to during the course of the trial was that the reason he did that was because he had been trying. Not only did he do that, he contacted the self-help desk because he was having difficulties opening it. What he had been told previously and what he had done in the past when he couldn't open particular documents was he would forward it to his own e-mail, to a separate e-mail address, because he had two e-mail addresses, an IGB e-mail address and a Department of Revenue e-mail address. And what he had been taught in the past was if it doesn't open under one, you might want to try forwarding it to another, and it can open there. So, yes, he did try and do it that way. But that was not sent to his personal home use account or anything like that. That was sent to another work address. But the Department maintains that John's actions in doing this were so sensitive and he became so concerned that they were going to find out that he had accessed this particular document or attempted to access the document and never actually accessed it, that he engaged in a plot to cover up his trail. And so what they continued to do was he went out and he searched high and low through all of the evidence vaults, all of the videotapes from the casino, to see if there was evidence out there to show what he had done. Now, John had previously conducted that exact same audit a year before. He had done the exact same thing one year before. He does it again this year because that's what he does. He does audits. In fact, the prior year, John had been commended, and as a result of his audit, it led to new procedures and new protocol that had to be followed by the casino. John was conducting this audit. Now, there's one critical fact, if you are going to accept the Department of Revenue's argument. There's one critical fact that is fatally flawed, fatally flawed, and that is these videotapes, there was no videotape of the IGB offices where he logged onto the computer. It wasn't there. So if he was trying to engage in an elaborate cover-up and an attempt to go around and steal evidence, doctor evidence, it was an impossibility because it wasn't there. And why wasn't it there? Well, it's pretty obvious. These are the offices of the regulators. The videos that are maintained are the security videos that are maintained by the casinos, by the casinos. Now, it doesn't take a leap of logic to understand that it would be inappropriate for the casino to be monitoring what the regulators are doing within their offices. So the entire underpinning, everything that their argument is based upon, is based upon a fact that is fatally flawed. Did he know that that room wasn't being monitored? Absolutely he knew it wasn't being monitored. I mean, number one, Justice Schmidt, I apologize, he worked at this casino for a number of years. He had gone into that building every day. One of his job duties was to oversee the video surveillance system. He knew where every camera was in that entire boat. Second of all, the only evidence was his testimony where he said that he knew it was not monitored. Third, the Illinois statute makes it clear that that is not to be monitored. It is a private space for the riverboat agents. And I think that just as a matter of common sense, this is a regulatory body who is regulating an entity. For the entity then to be conducting surveillance on them would be highly inappropriate under any set of circumstances. But even if that evidence wasn't in there, the burden of proof was on the Department of Revenue. They would be the ones who would have to actually establish that he didn't know that. We can look through all of John's evaluations, all of what's in the records, and they establish without question that he was very diligent. He did more audits than what he was ever required to do. He did more than anybody else who was there. He was very hardworking. He was very knowledgeable. Every single one of his categories were exceeded expectations. Knowledge of the job, understanding, everything exceeded expectations. This is the one area, the one area, their entire case is premised upon this particular fact. And the only thing that the administrative law judge said was, well, there wasn't any evidence. The detective didn't know. And we disagreed with that. In fact, we submitted an affidavit after the fact to the commission. The affidavit was never stricken. The affidavit was part of the record, and it was decided by the commission. There was no evidence anywhere, anywhere, to suggest that Goodnew Tech would not have known this. By the very nature of his job, he had to know this. He knew the statute. By the nature of the statute, he had to know this. Everybody, every gaming employee, every revenue employee who works on a boat would know this. That's the one fact. And the finding on it, it's just a stretch by the administrative law judge. Well, he probably knew. He probably didn't know this. That's essentially what the administrative law judge is saying. But they have the burden of proving that. There's no evidence anywhere to support that particular factual finding. And that factual finding is the underpinning for everything in this case. Let me just, from a matter of common sense, I mean it does make sense to me to somehow to have somebody watching the watchers of the court because from a common sense standpoint, if, I'm not talking about your client, but if somebody were working for the gaming board and were corrupt, there would be a lot of opportunity. This is the state of Illinois. We can't talk about corruption in this state. And so it would make sense to in some ways monitor those who are monitoring others to make sure that they're doing things. Let's take your example and follow it, play it out. Let's say that the administrative offices of the gaming board were concerned about corruption within the gaming agents and they wanted to monitor those agents. I think it's a scenario which you're talking about. If they were going to do that, then they would be the ones who would install the cameras. They would be the ones who would be doing the monitoring of that. The videotapes in question here, all the videotapes that John ever accessed, or he argued that he ever accessed, were videotapes that belonged to the Empress. So while I understand what you're saying, the idea somehow that the Empress, that there would be any rational reason why the Empress Casino would be monitoring what the regulators are doing simply isn't accurate. And so if that situation were to occur. I want to move to a point of law that I think is fairly significant from a procedural standpoint. And this was part of the recommendation that was adopted by the commission. In a footnote to the recommendation, the administrative law judge states, this section, this is a footnote after findings of fact, it says, this section is a statement regarding relevant and or contested facts that issued before the ALJ. It is not an exhaustive summary of every fact relied upon in reaching this recommended decision. I'll show you two minutes. Thank you very much. Now I suggest to you that under the Administrative Review Law and Administrative Procedure Act, that is inappropriate. A finding of fact, if you are going to rely upon a finding of fact in reaching a decision, it must be stated. That's what the law says. The reason for that is because it provides the opportunity for a reviewing court to fully review the record. Isn't the remedy for that that we only look at those facts that she specified in her decision? That's an interesting question, Justice Wright. That, I suppose, could be one of them. I guess my thought on that was always that that would warrant a remand. But then we get into another question here because the findings of fact and the questions of law seem to me to be somewhat jumbled. I mean, there are only, I think, ten separate findings of fact. For example, a lot of the things that are the underpinnings of the decision are actually reached in the statement of law section. And so I think it becomes problematic to simply say, well, let's just look at these findings of fact because these findings of fact are limited. And I don't think that, for example, the finding of fact that Mr. Gnutek somehow knew that these videos, or didn't know that his actions weren't being monitored, if that were, that's not a finding of fact that is actually reached, I don't think. That is back in his ultimate conclusion of the recommendation. And so if we want to rely just on the actual findings of fact, I mean, I think that that's probably an appropriate thing to do. Well, no, I'm sorry. He does say the processing room where this occurred is not subject to surveillance, but there is no evidence that Gnutek was aware of that. So I do apologize, Justice Wright. He did make that as a finding of fact. But I thank you very much. Thank you, Mr. Baker. Mr. Bombay. Good morning. May it please the Court. I'm Sunil Baway, and I'm an Illinois Assistant Attorney General here on behalf of the Appalachian Cross-Bound Illinois Department of Revenue. Mr. Gnutek's counsel has really focused his argument on the October 3, 2007, email incident that occurred in the Illinois Gaming Board's room at the Empress Casino. The facts of that incident are in dispute, and Mr. Gnutek relies only on his own testimony. But what he fails to disclose to this Court is that the commission found explicitly that his testimony was not credible and that his explanation was incorrectious. On October 3, 2007, Gnutek arrived to work and started working on a work computer without logging in. Now, this is highly irregular procedure. IGB employees have to log in through a system that requires them to put two different passwords in before they can access their account. I'm sorry, what date are we talking about? August 3, 2007, the date of the email incident. He spent a significant amount of time combing through Mr. Pitara, who's a co-IGB agent's email account. And when he was unable to download the STIC report, which is the Statewide Terrorist Information Center report, he contacted the Department of Revenue's computer help desk and then misrepresented his own identity as that of Vincent Pitara. Now, this is all on the record, and the ALJ found that this testimony was more credible than Gnutek's explanation that he arrived to work and had blurry vision because his father had just passed away. Because the standard of review on this issue as to whether the department has proved its charges against Gnutek is to determine whether that finding is against the manifest weight of the evidence, the question is, does the record demonstrate that an opposite conclusion is clearly apparent or clearly evident? And certainly not here. There's enough evidence in the record to conclude that Mr. Gnutek was snooping around on August 3 to find any information that he could, that could support his federal lawsuit that he had pending against the State of Illinois and the Department of Revenue at that time. With respect to the surveillance cameras in the gaming board, there were no surveillance cameras in the gaming board. I think that's undisputed in the record. But what is also undisputed is that there's no evidence to establish that Mr. Gnutek knew that surveillance cameras were not in the gaming board. We agree that Mr. Gnutek has been a senior revenue agent for a number of years and is involved in surveillance audits at the Empress Casino. What is also in the record, though, is that surveillance cameras exist outside of the gaming board's office. And thus, his entry or exit from the gaming board office was subject to surveillance. And therefore, the department could narrow down the time that Mr. Gnutek was in the office working on Vincent Potara's email address. So Mr. Gnutek knew that his conduct could have been subject to surveillance. His misconduct, I should say, could have been subject to surveillance. Now, at the Empress Casino, video— Can I ask you a question about the August 3rd incident? Wasn't there a point he was in there for 20 or 30 minutes on Potara's account? Wasn't there a point where the plaintiff actually logged off and then logged back on to his own account? Or do I have that wrong? I'm not aware of that. I know that while he was on the account, I'm not aware whether he had actually logged off and then logged back on to his account. I had an understanding of the facts that it was Potara who discovered when he came back into the office that the plaintiff's email account was up. Right. You're right. That is correct. He hadn't logged off. And Potara actually saw that the plaintiff was receiving emails from him that he hadn't sent. Right. That is correct. That Potara had recognized that his emails had been forwarded. So then he contacted Ransom for Robinson, who was their supervisor. And what Ganutech had explained to Potara was, well, Mr. Robinson had forwarded me those emails, your emails. So Potara speaks with Ransom for Robinson, and Robinson tells him, no, I never did that. Potara goes and confronts Ganutech and says, Robinson denies ever forwarding you those emails. And what does Ganutech respond with? He actually responds with a derogatory racial slur against his supervisor. But the evidence taken as a whole does demonstrate there's at least sufficient evidence to establish that Ganutech was on Potara's email account and knew that he was on Potara's email account. Now, at the Empress Casino, surveillance videotapes are retained for 14 days. And after 14 days, sometime around that time, those videotapes are deleted so that the tapes can be used again. Now, lo and behold, exactly 14 days after the August 3, 2007 incident, Ganutech says that he's conducting an audit. And IGP agents perform surveillance audits at the Empress Casino to ensure that video surveillance equipment is properly functioning, that the surveillance tapes are properly locked. Now, he says that he's performing an audit that he had conducted similar to what he had conducted in 2006. Well, the 2006 audit lasted four hours, and the testimony was that he examined thousands of videotapes in 2006. In 2007, on August 17, Ganutech started the audit with only one hour left on his shift and notably did not examine a single videotape. What he did do was he looked at the tape release logs. And the purpose of that, and I think the Commission was within its discretion to find, that the purpose of looking at the tape release logs was to determine whether any superiors had removed the tapes that could possibly show that he had committed misconduct at the IGP office. Again, the standard of review is whether the Commission's finding in this regard is... That was in light of the previous conversations that he had with Petara and Robinson, or about Robinson and what Robinson authorized him to do. Right. It's our contention that Ganutech was snooping around at the surveillance offices to examine the tape release logs to determine whether his misconduct on August 3, which is 14 days prior to the date of his supposed audit, was monitored. I don't think it's a very tough issue that the Department has proved its charges against Ganutech. Again, the Commission's findings are given deference. It is the fact finder, and it made the explicit credibility determination that Ganutech was not credible. I think where the battle really is drawn here is on our cross appeal, whether the charges that have been proven by the Department constitute sufficient cause to discharge Mr. Ganutech. We believe it does. We believe that Ganutech's misconduct makes him incredible, makes him not trustworthy, and compromises his ability to serve as a sworn law enforcement agent of the Department of Revenue and the Gaming Board. And what I believe happened here was the Commission failed to give sufficient consideration to Mr. Ganutech's unique position as a law enforcement agent. What we have here is an agent who has displayed a proclivity to abuse his access to confidential information. As a police officer, he has access to confidential information, is involved in sensitive and confidential investigations, and he's shown an attitude to take what information he can and use it for his own personal gain. Again, he had a lawsuit pending against the state of Illinois, and we believe that he was snooping around to find any useful information that he possibly could find to support his lawsuit. Does the purpose he was snooping around for matter here? It doesn't really matter that he used the information for personal gain, does it? I think it does. I think it does matter because the access that he has to confidential information is limited for his work purposes. And I think the fact that he was looking for information unrelated to work is why we can no longer trust him. Again, one thing that counsel for Ganutech did not point out was that prior to this email incident, Ganutech received, removed, and released confidential state documents, which was an official action request form of an ISP, Illinois State Police employee, Mark Stevens. Now, at that time, Ganutech had applied for a promotion for the same position that Mr. Stevens had applied for. Mr. Stevens received that promotion. Well, Ganutech came into possession of an official state document pertaining to Mr. Stevens. Now, again, I think that the commission, it's fair to conclude that the reason Ganutech looked for that OAR was to find out, again, any information, go on a fishing expedition to determine whether there was anything he could use against the department and the state of Illinois. That was what the lawsuit was about, right? Right. What was that lawsuit? Well, the lawsuit, the crux of the lawsuit that was pending at the time was a gender discrimination lawsuit. The OAR, though, if it doesn't go directly to the lawsuit, it goes to Ganutech's suspicion that somebody is out to get him, that there is some ulterior motive by the department, that he wants to find any information that he can that can place the department in a negative light. Now, an employee who conducts himself in this manner certainly cannot be employed anymore by the Department of Revenue. And, again, there is a public record now that explicitly found him to be not credible. If Ganutech is involved in any other investigations, that is impeachment evidence. His investigations will be compromised. We believe that the commission did not give adequate consideration to these issues. Now, what the commission found was discharge was not appropriate because there was no evidence. Let me go back to that thought, that he had been found not credible. Right. That has no bearing on whether he should have been disciplined or terminated. I mean, it just doesn't. Correct? The AL judge's findings that he wasn't credible, is that something we can consider in supporting the decision whether to suspend or terminate him? I think that it is something that this court can consider and that the commission should have considered given the unique position of Mr. Ganutech. He's a sworn law enforcement officer that's taken an oath to uphold the public's trust and to protect the public. And someone who's not credible is someone whose duty to protect the public will likely be compromised. All right. Well, I'm going to respectfully disagree with you because I think the fact that maybe he hadn't given an honest answer to a supervisor investigating why he was on the e-mail may be grounds for discipline. But the AL judge's finding that he wasn't credible and not so certain is a basis for suspension or termination. But go ahead. Thank you, Your Honor. Again, Ganutech also has displayed a proclivity to look past other employees' misconduct when it serves his own interests. Now, this relates to the OAR, where Ganutech knew that the former interim administrator of the IGB, the gaming board, Janet Tamayo, and another co-agent, Thomas Hobgood, had come into possession in an unauthorized manner of the OAR. At that time, he had a duty to report that misconduct by Tamayo and by Hobgood to superior officers. And even though Tamayo is the – was the interim administrator and the top official at the IGB, there is a group of people higher than the administrator, and that's the gaming board. He could have reported this to the gaming board. And again, Ganutech was a department employee. He could have reported it to a superior officer within the Department of Revenue. Now, what the commission relied upon in reversing discharge and ordering a mere 90-day suspension in lieu of termination was the fact that Ganutech did not receive any actual gain. There's no evidence in the record that Ganutech realized a gain from his misconduct. But the department's rules do not place a condition precedent on discharge requiring an actual gain. Moreover, the commission doesn't explain in any way why an actual gain is really relevant. The fact that Ganutech thought he would gain, we think, is sufficient for discharge. Again, we believe Ganutech is not trustworthy, he's not credible, and given his unique position as a law enforcement agent, termination was appropriate. So the gain would have been the – is he gave that information to his lawyer? Right. Right. So the gain would have been an advantage in the lawsuit? Is that presumably? We think that that is what we believe the gain to be. Indirectly, at least. Right. Exactly. If there are no questions, we do respectfully request that- I have a question. Okay. Really, when deciding whether he should be terminated or suspended, don't the department's own rules require first an examination whether the conduct would warrant termination? And if it does, you don't go on to consider past history, good performance, reason for the violation, et cetera? I mean, isn't the fact that what he did wrong, what he was found to have violated, was a basis for termination? Discussion ends there. We contend, yes, that is where the discussion should end. We believe that- And to go beyond that and just reduce the punishment or suspend him, actually, how do we know in the next case whether they're going to follow the new rule or the old rule? I mean, isn't that what kind of makes this reduction in the punishment somewhat arbitrary? I think so. Yeah, right. And I think that's a position that we've explained in the brief, that the misconduct here, we believe warrants immediate termination. The commission should have first given careful consideration to that issue before moving on to look at his past performance record. But notwithstanding the past performance record, we still argue that termination was the appropriate punishment. Okay. Thank you. Mr. Walker. Mr. Baker, some rebuttal? Yes. Thank you. Thank you very much. A lot of stuff there. Not a lot of time, unfortunately. First, can I ask you, before you get started, just one thing, because I was reading your body English back there. What about the evidence that Mr. Gnutek, when he called the help desk, represented himself to be someone other than Mr. Gnutek? Mr. Blavey was not the trial counsel in this. I defy him to look anywhere in the record and see where he claimed that this is Vincent Patera. I defy anyone to find that anywhere in the record where John Gnutek picked up the phone and said, yes, hi, this is Vincent Patera. Did he say, hi, this is John Gnutek? Respectfully, Justice Wright, I don't recall. This was a trial that took place a long time ago. I don't recall specifically what he said. He contacted the help desk and he told them that he was having a problem accessing an email. There are a number of other facts that Mr. Blavey cited that are flat out wrong. Okay? Number one, they maintain, well, John was just snooping around for information for his lawsuit. John didn't have a lawsuit at this time. All right? The OIR incident occurred in December of 2006 right now. All right? We turned that document over along with more than 1,600 other pieces of information, part of our initial disclosures in the federal proceeding. That's when they first saw it. I guess they didn't think it was terribly significant because they didn't do anything with it for a number of months. That's when we turned it over. After that, for strategic reasons, John wanted to dismiss his lawsuit against the department. And I believe the dismissal was in January of that year. When these incidents occurred, these July and August incidents, or excuse me, August 3rd and August 17th, John did not have a lawsuit against the Department of Revenue. It wasn't there. So the thought that he is sitting snooping for evidence to provide to me in support of his lawsuit, there was no lawsuit. And which incidents are you talking about? The later ones with the computer or the earlier ones with the document? The later ones with the computer. But the earlier ones with Tamayo and Hopgood, the lawsuit was pending then? The lawsuit was pending. Well, actually, I don't think the lawsuit was pending then. The lawsuit was pending when they found out about that. What had happened, this document, this OAR, they make it out to be a significant document. It's merely a personnel transaction form that said that Stevens got the job, okay? This was not a bone of contention. This was a document that was turned over by them in discovery to us, and we turned it over to them as well. This document was given. John did not. They maintained that John sneaked around and found this document. That's not true. John worked in Joliet. This document was in the Chicago office. John didn't go to the Chicago office. Jeanette Tamayo, who was the administrator, the top person there at the gaming board, and, again, this is undisputed, she is the one who gave it to him. She is the one who gave it to him. In this federal lawsuit, the federal rules of evidence obligate you to turn over any document that you have that is relevant. It was a relevant document. But the document had absolutely next to nothing of evidentiary value because it established something that wasn't in question. There was no dispute of fact over that. Isn't the problem with that that nobody knew that until he had the document in his hands? I'm sorry. Nobody knew what? Nobody knew that it had no real relevant information until it was in his hands, right? I mean, I don't think. Maybe Tamayo. Well, Tamayo gave John a number of different documents. She gave him e-mails. There's a whole group of documents that she gave to John, okay? I don't think John ever thought that one way about whether this document was significant. It wasn't as if John said, hey, can you get these documents for him? She just gave them to him. That's the undisputed. In a restaurant. I'm sorry? In a restaurant that they agreed to meet at. Well, no. She gave them to Hobgood. Hobgood gave them to John. She gave them to Hobgood and Hobgood said give these to John. But again, Justice, you have to understand. This person was the top person at the agency. The top person at the agency. And she is giving the documents. The rules say that the administrator has the authority to release documents. That's what the rules say. And we submitted that rule into evidence. Thank you. Would you speak to the suspension issue? I would, yes. You can look long and hard and you will not find one written opinion in the state of Illinois where an appellate court or the Supreme Court has ever found that the discipline imposed by the Illinois Civil Service Commission or any comparable board or commission throughout the state that assesses discipline was too lenient. You won't find it. You find some that go the other way that says it was too harsh. But you never find one. Ever. No written opinion exists. That's because the statute creates the discretion for the Civil Service Commission to determine what is the appropriate level of discipline. Provided the act requiring discipline would not support termination. No. That's not what it says. The law says, the law doesn't say provided that the act wouldn't. What the law says is, is there a good cause for discharge? The Illinois Administrative Code defines good cause. Good cause is that which renders an employee, the public policy would determine renders an employee ineligible for the continuation in service. That's what that is. The law has also clearly established that there is a two-pronged process. There is a guilt phase and a punishment phase. Thank you. Thank you very much. Justice Wright, did you have any further questions? No. I'd like you to finish that thought. Okay. And I do appreciate the court giving me some additional time on this. But there are two separate phases. Right. They're both there. It's the commission. The meat of your argument. Well, it's the commission that is there to decide what is the appropriate punishment. There's no decision, oh, this is the sort of thing that renders determination automatic. There is no standard out there for that. The Department of Revenue itself cannot determine to terminate somebody. All right. Thank you. Thank you. Mr. Bobbe, cross-reply? Thank you, Your Honors. May it please the Court. With respect to the federal lawsuit, I'm handling that federal lawsuit that's on appeal at the Court of Appeals, and Mr. Baker is handling the lawsuit for Mr. Gnutek. That was filed in 2006. Now, I stated in my argument that the surveillance issue with respect to finding out, excuse me, the August 3, 2007 email incident with hunting for any information that could assist him in his federal lawsuit that occurred in 2007. So that would be after the lawsuit was filed. Now, the administrator of the Gaming Board did not have authority to issue, to release the OAR. Just because Janet Tamayo was the top official at the Gaming Board does not mean that she had any authority to release it. And Marcus Grotsky, who is the current administrator, he testified to that. He said that an administrator cannot release it for any reason other than specific work purposes. The law that Mr. Baker relies on states that all materials and information supplied to or used by IGB personnel which relate to the administration or enforcement of the Riverboat Gambling Act are confidential except a specific authorizer released by the administrator. There's nothing in the record to suggest that the OAR has anything to do with the administration or enforcement of the Riverboat Gambling Act. This was a confidential document that contained personal information of an Illinois State employee, Illinois State police employee, Marcus Grotsky. So that is not actually the law that authorized any release of the OAR. Mr. Bob, I hate to interrupt you, but I think you're limited on your reply here to the cross-appeal. Right. And I do think that some of these issues do go to the issue of termination also because What we contend is that the misconduct itself warrants immediate termination. Now, the New Text Council relies on the Illinois Administrative Code which lays out a two-step process to determine what the proper punishment should be. Section 80, Illinois Administrative Code, 1.170 subsection A lays out that two-step process. But subsection B states that the commission must first initially determine whether termination of employment is immediately warranted based on the misconduct committed. And then, if immediate termination is not warranted, then to move forward and determine whether past performance and a prior work history mitigates against termination of employment. And again, we contend that immediate termination of employment was warranted under the misconduct. You say past performance mitigates against termination of employment? Right. The commission is – the Administrative Code authorizes the commission to take that into consideration. The employee's work history. And one question. This federal lawsuit, has it been dismissed or is it on appeal? With respect to Mr. – it's on appeal. With respect to Mr. Gnutek, his claims were dismissed under race judicata. What we had argued was that these issues have been – Has he had a live lawsuit going today, yes or no? On appeal, yes. It's on appeal? Yes. And he's appealing something? Correct. He's appealing the judgment against him. I thought Mr. Baker said he dismissed it or something. He did. I know this is odd. It is odd, but I'd like some clarity here. The problem is there are multiple lawsuits. Mr. Boisville is correct. There is a case on appeal. We filed a federal lawsuit challenging his termination. That occurred after all of this. This occurred after he was terminated. That is the case that Mr. Boisville is handling on appeal. The original case was a gender discrimination case that was brought. That was dismissed in late 2006 or early 2007. At the time these things occurred, no lawsuit. I may have misspoken. There is a lawsuit pending, but there was a lawsuit pending in 2006 when the email incident occurred. And that was a gender discrimination lawsuit. Was that also pending at the time of the transfer of the OAR? No, it wasn't. Okay. No, it wasn't. Would you speak to the rule, which is 1.17 subparagraph B that says, unless the disciplinary violation would warrant immediate discharge, the commission then shall. What is your interpretation of the word unless? My interpretation would be that the commission must determine whether immediate discharge is warranted unless it first Excuse me. Initially the commission must determine whether immediate discharge is warranted. And if discharge is not warranted, then it should consider the past performance. And I understand your argument that once you get to that second phase, termination is still appropriate. But your position, do you have a position regarding whether the conduct for which he was disciplined would have warranted discharge? Do you have a position on that standing alone without regard to previous service? Yes, we do. And what is your position? Our position is that the misconduct of Gnutech warrants immediate discharge. Okay. And it's a substantial shortcoming, which renders the employee's continuance in his position in some way detrimental to the discipline and efficiency of the service. Right. Yeah. By him snooping around and hunting for confidential information to use in an authorized manner. Do you consider that cause for discharge? Yes, we do. All right. But you have an alternative argument that even if it wasn't considering his past performance? That's correct. All right. I understand your argument. Thank you. Thank you, Your Honor. Thank you. Okay. No further questions. All right. Thank you. No further questions. All right. Thank you both for your arguments here today. The matter will be taken under advisement. Written disposition will be issued. The court will now be in recess for lunch and will reconvene at 1.15.